1 | SEYFARTH SHAW LLP
Thomas R. Kaufman (State Bar No. 177936)
2 | Regina A. Musolino (State Bar No. 198872)
2029 Century Park East, Suite 3300
3 | Los Angeles, California 90067-3063
Telephone: (310) 277-7200
4 | Facsimile: (310) 201-5219
Email: tkaufman@seyfarth.com
5 |         rmusolino@seyfarth.com

6 | WILSON PETTY KOSMO & TURNER LLP
Claudette G. Wilson (State Bar No. 110076)
7 | Leonid M. Zilberman, Esq. (State Bar No. 182829)
550 West C Street, Suite 1050
8 | San Diego, California 92101
Tel:  (619) 236-9600
9 | Fax: (619) 236-9669
Email: cwilson@wpkt.com
10 |        lzilberman@wpkt.com

11 | Attorneys for Defendant
COUNTRYWIDE HOME LOANS, INC.

12

13                  UNITED STATES DISTRICT COURT

14                SOUTHERN DISTRICT OF CALIFORNIA

15

16 | RAYMOND VINOLE and KEN YODER, on        ) Case No. 07 CV 0127 DMS  WMc
behalf of themselves and all others similarly  )
17 | situated,                                     ) **NOTICE OF MOTION AND MOTION**
                                               ) **TO DENY CLASS CERTIFICATION;**
18 |                  Plaintiff,                  ) **MEMORANDUM OF POINTS AND**
                                               ) **AUTHORITIES IN SUPPORT**
19 |           v.                                 )
                                               ) **[Appendix of Evidence Concurrently**
20 | COUNTRYWIDE HOME LOANS, INC., a        ) **Under Separate Cover]**
New York corporation; and DOES 1-10,          )
21 | inclusive,                                   ) Date:          October 19, 2007
                                               ) Time:          1:30 p.m.
22 |                  Defendant.                 ) Crtrm.:        10, 2nd floor
                                               )
23                                              )
                                               )
24 | _____ )

25 |        **TO PLAINTIFFS RAYMOND VINOLE AND KEN YODER AND THEIR**

26 | **ATTORNEYS OF RECORD:**

27 |         **PLEASE TAKE NOTICE** that on October 19, 2007, at 1:30 p.m., in Courtroom 10 of

28 | the above-entitled Court, pursuant to Federal Rule of Civil Procedure Rule 23, Defendant

LA1 6646215.5                                              07 CV 0127 DMS WMc

1 │ Countrywide Home Loans, Inc. ("Countrywide") will and hereby does move the Court for an

2 │ order denying class certification to the putative class action of Plaintiffs Raymond Vinole

3 │ ("Vinole") and Ken Yoder ("Yoder") (collectively, "Plaintiffs").

4 │      The grounds for this Motion are that federal law allows any party to move the court as

5 │ early as reasonably practical for an order determining whether the action can proceed as a class

6 │ action.  Here, the evidence indisputably shows that individualized issues predominate over

7 │ common ones and that class litigation is not the superior method of litigation, thus making

8 │ certification inappropriate under Rule 23 of the Federal Rules of Civil Procedure.

9 │      This Motion is based on this Notice of Motion and Motion; the accompanying

10 │ Memorandum of Points and Authorities; the concurrently-filed Appendix of Evidence; all

11 │ pleadings and documents on file herein; and on such other and further oral and documentary

12 │ evidence as may be presented at or before the hearing on the Motion.

13 │

14 │ DATED: August 7, 2007           SEYFARTH SHAW LLP

15 │

16 │              By

17 │                 Thomas R. Kaufman
   │                 Attorneys for Defendant
   │                 COUNTRYWIDE HOME LOANS, INC.

2

MEMORANDUM OF POINTS AND AUTHORITIES ............................................3

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

RELEVANT FACTS .................................................................................5

LEGAL ARGUMENT ..............................................................................11

    I.      THIS COURT HAS THE POWER TO GRANT A DEFENSE
           MOTION TO DENY CLASS CERTIFICATION ..............................11

    II.     CLASS CERTIFICATION IS IMPROPER HERE BECAUSE
           PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS OF RULE
           23(B)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE ....11

         A.    Plaintiffs Cannot Establish Predominance of Common Issues 12

         B.    Plaintiffs Cannot Satisfy the Superiority Requirement of Rule
              23(b)(3) ...................................................................................21

CONCLUSION .......................................................................................24

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Amchem Prods. v. Windsor,*
 521 U.S. 591 (1997)..............................................................................23

4

*Billingslea v Brayson Homes, Inc.,*
5
 2006 U.S. Dist. LEXIS 11707 ...............................................................14

6

*Crawford v. Honig,*
 37 F.3d 485 (9th Cir. 1994) ...................................................................23

7

*Ford v. NYLCare Health Plans, Inc.,*
8
 190 F.R.D. 422 (S.D. Tex. 1999)...........................................................22

9

*General Telephone Co. of S.W. v. Falcon,*
 457 U.S. 147 (1982)...............................................................................12

10

*Hackett v. General Host Corp.,*
11
 455 F.2d 618 (3rd Cir. 1972) .................................................................22

12

*Jewel Tea Co v. Williams,*
 118 F.2d 202 (10th Cir. 1941) ...............................................................14

13

*Jimenez v. Domino's Pizza, Inc.,*
14
 238 F.R.D. 241 (C.D. Cal. 2006).........................................13, 19, 21, 22, 23

15

*Love v. Turlington,*
 733 F.2d 1562 (11th Cir. 1984) .............................................................13

16

*Lumpkin v. E.I. DuPont De Nemours & Co.,*
17
 14 F.R.D. 480 (M.D. Ga. 1995).............................................................11

18

*Matarazzo v. Friendly Ice Cream Corp.,*
 62 F.R.D. 65 (E.D.N.Y. 1974)...............................................................24

19

*Poulos v. Caesars World, Inc.,*
20
 379 F.3d 654 (9th Cir. 2004) .................................................................12

21

*Sepulveda v. Wal-Mart Stores, Inc.,*
 237 F.R.D. 229 (C.D. Cal. 2006)....................................12, 13, 15, 21

22

*Sipper v. Capital One Bank,*
23
 2002 U.S. Dist. LEXIS 3881 (C.D. Cal. Feb. 28, 2002).....................11

24

*Southern Snack Foods, Inc. v. J&J Snack Foods Corp.,*
 79 F.R.D. 678 (D.N.J. 1978)..................................................................24

25

*Sweet v. Pfizer,*
26
 232 F.R.D. 360 (C.D. Cal. 2005)...........................................................23

27

*Valentino v. Carter-Wallace, Inc.,*
 97 F.3d 1227 (9th Cir. 1996) .................................................................21

28

1

*Van Allen v. Circle K Corp.*,
    58 F.R.D. 562 (C.D. Cal. 1972) ......................................................................24

2

3

**STATE CASES**

*Earley v. Superior Court*,
    79 Cal. App. 4th 1420 (2000) .......................................................................22

4

5

*Fireside Bank v. Superior Court*,
    40 Cal. 4th 1069 (2007) ...............................................................................13

6

*People v. Wells*,
    12 Cal. 4th 979 (1996) .................................................................................16

7

8

*Ramirez v. Yosemite Water Co.*,
    20 Cal. 4th 785 (1999) .................................................................................15

9

*Spoon v. Superior Court* (1982) 130 Cal. App. 3d 735 ............................................22

10

*Walsh v. Ikon Office Solutions, Inc.*,
    148 Cal. App. 4th 1440 (2007) .............................................................19, 21

11

12

*Washington Mutual Bank v. Superior Court*,
    24 Cal. App. 4th 906 (2001) ........................................................................13

13

14

**FEDERAL STATUTES**

29 C.F.R. §541.106 ...................................................................................................16

29 C.F.R. §542.207 ...................................................................................................16

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Raymond Vinole and Ken Yoder ("Plaintiffs") are former External Home Loan Consultants ("HLCs") for Countrywide.  HLCs originate loans by finding potential mortgage loan customers wherever they may exist and persuading them to finance their home purchases, refinance, or enter into other mortgage loans with Countrywide.  They have near total autonomy in how they do their jobs so long as they meet their production goals.

Plaintiffs have brought this class action alleging that, as a group, the more than 3,000 individuals who have worked for Countrywide as HLCs in California since October 20, 2002 have been misclassified as exempt outside salespersons.  That is, Plaintiffs alleged that none of the HLCs "customarily and regularly" spends the majority of his or her work time engaged in sales activity away from the employer's place of business.  To justify certification of this case, Plaintiffs will need to establish that the exemption question can be answered as to the broad putative class of HLCs using collective proof.  But, as explained below, it is impossible for Plaintiffs to try this case using collective proof without preventing Countrywide from exercising its due process rights to raise individualized defenses to particular HLCs' misclassification claims.  Thus, the Court should enter an order denying class certification.

The outside sales exemption turns on how an employee divides his or her time between outside sales activity and other activities.  Logically, for this to be determined on a class basis, Countrywide would need to have a policy or practice that prohibited employees from customarily and regularly spending the majority of their time engaged in outside sales.  Countrywide has no such policy or practice.  In fact, HLCs are given tremendous autonomy as to how they spend their time.  Essentially, their only direction is to get out there and sell.  Given this, there is no way to determine the exempt status of any HLC without a very fact specific inquiry into how each HLC spends his or her time week to week.  Countrywide submits with this motion a sampling of fifty (50) declarations of HLCs from around the State of California, in which they discuss how they spend their time. The declarations reflect the wide variation in how

3

1    the HLCs carry out their specific job duties and divide time between "inside" and "outside"

2    activity.  The need to examine how each HLC performs the job to see if he or she meets the

3    standard for the outside sales exemption makes this case improper for certification.  Knowing

4    how Plaintiffs individually carried out their sales job will tell us nothing about how the other

5    3,000 plus HLCs customarily and regularly spend their workdays.

6         Predominance of individualized issues aside, this case is also a poor candidate for a class

7    action because it is not one that requires the class litigation device to give aggrieved employees

8    incentive to vindicate their rights.  On the contrary, given the large annual compensation most

9    HLCs earn (typically more than $100,000 and often more than $200,000), and the availability of

10   attorney's fees to a prevailing plaintiff (but not to Countrywide), HLCs have substantial

11   incentives to bring their own claims to the extent they feel that they did not customarily and

12   regularly spend more than half their work time engaged in outside sales activity.  Moreover,

13   Plaintiffs' counsel have already sent pre-certification notice to the putative class, have their

14   contact information, and are presumably ready, willing and able to take the case of any

15   individual HLC who expresses the belief that he or she was misclassified as an outside

16   salesperson. Given the highly individual nature of each claim and the large potential recovery for

17   each HLC, class litigation is simply not the superior method for litigation here.

18        Finally, a class action is not superior here because there is a conflict between Plaintiffs—

19   who are former employees seeking only to get money from Countrywide— and the many current

20   employees in the class who benefit from the flexibility attendant to being treated as outside

21   salespersons.  There is no groundswell among the HLCs to be converted to hourly employees

22   and, as the concurrently submitted declarations show, just the opposite is true.  This conflict

23   between Plaintiffs and the class they seek to represent provides an alternate reason for this Court

24   to conclude that individual litigation is superior to litigating Plaintiffs' dispute on behalf of the

25   entire proposed class.

26        For the foregoing reasons, Countrywide respectfully requests that the Court enter an

27   order denying class certification of this lawsuit.

28

4

**RELEVANT FACTS**

Countrywide is in the business of providing mortgages to home owners and buyers throughout California.  To sell these various home loan products, Countrywide employs HLCs in small satellite offices throughout the state.  These HLCs represent Countrywide in local communities, and specifically work with realtors, builders, and other potential business partners in order to develop business relationships and obtain referral business.  HLCs use those contacts to provide loan products to home owners and buyers.  Countrywide presently employs approximately 1,140 HLCs at over 130 locations throughout California.[1]

Countrywide established the HLC position as an outside sales position and trains its HLCs to perform it as such.  HLCs receive formal sales training from Countrywide,[2] and many HLCs put themselves through supplemental training to improve their skills.[3]  HLCs know that they need to get out of the office and meet face-to-face with current and prospective clients.[4]  To originate and close loans, HLCs must maintain close relationships with business contacts.[5]  Face-to-face contact is crucial to developing and maintaining these relationships – otherwise, potential customers will move on to the next vendor who has a loan product to sell.[6]

---

[1]    Declaration of John Bianchi ("Bianchi Dec.") ¶ 2; Ex. "A" (HLC Job Description).

[2]    Bianchi Dec. ¶ 3.

[3]    Bianchi Dec. ¶ 3; *see, e.g.*, Dec. of Patti Self at ¶ 15 ("I am also regularly working on improving my business getting skills because sales mastery is the number one factor in being a successful home loan originator"); Dec. of Karen Lopucki at ¶ 8 ("Even though I am an experienced sales person, I constantly try to improve my sales skills and recently completed a 3-day Tony Robbins seminar").

[4]    Bianchi Dec. ¶ 4; *see, e.g.*, Dec. of Sonia Teran at ¶ 6 ("People recognize faces, not names, and so I try to get out as much as possible"); Dec. of Ronica Bang at ¶ 8 ("Face-to-face contact is crucial in this relationship business"); Dec. of Sherrey Long Pridmore at ¶ 4 ("The home loan industry is basically run on relationships.  As a consultant, I am required to go into the field, meet people, and make connections.  The more you are in the faces of realtors, clients, and other potential referral sources, the better.").

[5]    *See, e.g.*, Dec. of Mark Dudzinzki at ¶ 3; Dec. of Fernando Jiminez at ¶ 7; Dec. of Elisa Soria at ¶ 7; Dec. of Geoff Miyao at ¶ 6.

[6]    *See, e.g.*, Dec. of Greg Young at ¶ 6; Dec. of Stacy Chester at ¶ 7; Dec. of Kathleen Acosta at ¶ 5; Dec. of Kim Henderson at ¶ 5; Dec. of Steven Millender at ¶ 5; Dec. of Wendy Reeder at ¶ 6.

5

This simply is not a job where a person can stay in the office and wait for the phone to ring – to be successful, a person has to get outside, get in front of decision makers, and sell.[7]  For individuals who are interested in an inside loan origination job, Countrywide has various other positions that are classified as non-exempt because they involve little if any time in the field.[8]

HLCs are paid entirely on a commission basis.[9]  Countrywide considers them to be outside salespersons, and accordingly their compensation is not hourly, but is based purely on their loan production.[10]  HLCs are paid to produce, and many HLCs are paid very handsomely, with some earning several hundred thousand dollars per year for their efforts.[11]

It is up to each HLC to structure his or her own job so as to meet sales goals.  This is a very entrepreneurial position,[12] where people can make decisions about how much they work based on how much free time they desire,[13] how much compensation they are seeking,[14] and

---

[7]     Bianchi Dec. ¶ 4; *see, e.g.*, Dec. of Greg Young at ¶ 8 ("I cannot simply sit at my desk and take phone calls to bring in business.  I have to be out in the field, making contacts."); Dec. of Linda Rae at ¶ 6 ("The most important thing that determines how many sales a HLC gets it [sic] how aggressive he or she is.  I need to be out there, in the field, completely accessible, so that I am there to take a lead no matter when it comes.  I don't generate business by being in the office"); Dec. of Kathleen Acosta at ¶ 5 ("Being out of the office meeting people is important because in this job, you cannot be a 'secret agent.'  This business is all about how many people you know").

[8]     Bianchi Dec. ¶ 5.

[9]     Bianchi Dec. ¶ 6; *See, e.g.*, Dec. of Maridee Bryant at ¶ 10; Dec. of Deborah Dexter at ¶ 15; Dec. of Jose Villanueva at ¶ 10.

[10]    Bianchi Dec. ¶¶ 2, 6, Ex. "A" (HLC Job Description).

[11]    Bianchi Dec. ¶ 6.  *See also* Dec. of Chris Ruckel at ¶ 19 ("I like working on a commission basis because there is no ceiling on my potential earnings.  There are not that many jobs out there that allows you to make $20,000 per month with high school education").

[12]    *See, e.g.*, Dec. of Joel Fahres at ¶ 6 ("To be successful, you need to act as if you are self employed.  I look at my situation as the same as having a franchise.  My job is to make my personal Countrywide franchise as successful as I can.").

[13]    *See, e.g.* Dec. of Deborah Hartwick at ¶ 12 ("Because I am my own boss, I decide how to organize my day so I can best meet my business goals and personal commitments"); Dec. of Sonia Teran at ¶ 5 ("overall I am free to come and go as I please, which is important to me as a single mother"); Dec. of Gabriel Gomez at ¶ 4 ("On some days I work only one or two hours, and on other days I work eight hours.  I rarely, if ever work more than eight hours.  On most days I work about six hours"); Dec. of Esvelia Esparza at ¶ 11 ("because my schedule is flexible, I am able to spend more time during the week with my children").

[14]    *See, e.g.*, Dec. of Samantha O'Rourke at ¶ 4 (goal is to make $150,000 per year so she works to close four to five units per month to meet that goal); Dec. of Deborah Dexter at ¶ 5 (personal business goal is to generate $10,000 in commissions per month by having a sales

6

1    what they are most comfortable doing.[15]  HLCs have the individual opportunity to balance these

2    goals and develop the schedule that suits them best.[16]

3            This high level of autonomy is important.  Markets and market conditions vary and how

4    each individual HLC adapts is very different.  A non-exhaustive list of factors that may influence

5    the duties of an HLC include:

6        •    Whether there is a focus on a specific industry;[17]

7        •    Whether there is a focus on realtors or builders as business partners;[18]

8        •    Whether there is a focus on a specific demographic within the community;[19]

---

9    volume of $2 million); Dec. of Chris Ruckel (personal goal is to make $300,000 to $400,000 per

10   year, which means he spends 75% of his time soliciting new business).

11   [15]    *See, e.g.*, Dec. of Cheryl Jackson at ¶ 6, 13 (flexibility of the position allows her to balance personal business goal of $65,000 with need to be available to pick up daughter from

12   dialysis treatments); Dec. of Linda Rae at ¶ 15 (was able to have carpal tunnel surgery without most of her customers even knowing she was gone and still make the kind of money she wants).

13   [16]    *See, e.g.*, Dec. of Scott Condon at ¶ 4 (structures his days so he can take his kids to school every day and be available for family related events); Dec. of Gabriel Gomez at ¶ 5

14   (regularly leaves work twice a week at 3:00 p.m to attend daughters' soccer games); Dec. of Alfonso Hernandez at ¶¶ 5, 6 (unlike previous 9-7 job, he is now able spend more time with his

15   family but still make a good living); Dec. of Kate Ferguson at ¶ 3 (given compensation goals, needs to talk to 24 people a day, to get 15 applicants a month, to generate 10-12 closings per

16   month); Dec. of Margaret Caddell at ¶ 12 ("I do not have a set schedule that is dictated to me and I am free to spend my time which ever way I wish."); Dec. of Patti Self at ¶ 17 ("There were

17   times when I was unable to come to work and was receiving cancer treatment.  Nobody, including the branch manager, ever questioned my commitment to my job.  I continue to juggle

18   work with family commitments and medical appointments related to my health.").

19   [17]    *See, e.g.*, Dec. of Sabrina Thai at ¶ 4 (many of her clients are in medical professions); Dec. of Kathleen Acosta at ¶ 11 (many nurses as clients); Dec. of Larry Depugh at ¶ 4 ("I also

20   regularly solicit family law attorneys because they constantly deal with clients who need to sell their homes to split assets and purchase new ones"); Dec. of Patti Self at ¶6 ("I market to out-of-

21   state and foreign clients.").

22   [18]    *See, e.g.*, Dec. of Mark Greenbaum at ¶ 3 ("My personal business plan included soliciting to real estate offices, participating in realtor caravans, and marketing to past and current

23   clientele"); Dec. of Benjamin C. Mendoza at ¶ 4 ("Approximately 70% of my business comes from contractors or custom home builders"); Dec. of Brian Booth ("my personal business model

24   focuses on builders"); Dec. of Cheryl Jackson at ¶ 4 ("I bring in the majority of my loans from real estate agents and from referrals from friends, family, and past customers"); Dec. of Scott

25   Uhls at ¶ 4 ("I am constantly going out to work with new builders").

26   [19]    *See, e.g.*, Dec. of Fernando Jimenez at ¶ 7 ("I am certified to originate CalPERS loans, and I speak both English and Spanish, so attending events where government workers or

27   members of the Hispanic community will be present helps me market to those groups in particular"); Dec. of Duan "Young" Nguyen at ¶ 3 ("I like to market to high-end home owners

28   such as doctors and lawyers"); Dec. of Johnny Delgadillo at ¶ 4 ("My personal business plan includes a focus on new home buyers and government assistance layered loans.  I also sell about 90 percent of my loans to Spanish-speaking customers"); Dec. of Elisa Soria at ¶ 4 ("I work with

7

- •     Whether there is a focus on charitable activities as a way to generate business;[20]

- •     Whether the individual has a Personal Assistant to assist them;[21]

- •     Whether the local community presents the ability to attend real estate caravans, Multiple List Service meetings, or other realtor meetings to generate business;[22]

- •     Whether the individual can make use of the local Chamber of Commerce or other business organizations as a business tool;[23]

- •     Whether the market is mature enough that past referrals can be a large part of the business;[24]

- •     Whether personal hobbies can be used as a marketing tool;[25] and

non-profit organizations . . . . These developers build homes as non-profit organizations, they get tax credits from the city and have a quota of the amount of housing that they must provide to low income people. I develop relationships with them, so that they give me referrals to finance home loans"); Dec. of Sonia Teran at ¶ 4 ("I am certified in multi-cultural sales, so much of what I do is focused on the Latino and African American communities").

[20]     *See, e.g.*, Dec. of Kate Ferguson at ¶ 5 ("I am the founder and director for Shoes for Students, which is a non-profit organization supported by the Santa Maria Board of Realtors"); Dec. of Rob Roberson at ¶ 7 ("I also attend Chamber of Commerce functions, go to community luncheons, and am very active in my church").

[21]     *See, e.g.*, Dec. of Chris Ruckel at ¶ 4 ("Once a customer agrees to submit a loan application, I have a Personal Assistant who helps me with loan processing. She spends the majority of her time in the office processing paperwork, while I spend most of my time out of the office soliciting new clients to ensure a constant flow of new business"); Dec. of Deborah Hartwick at ¶ 6 ("Currently, my goal is to spend at least 75% of my time soliciting new business, because once the loan process is begun, I have a team of people at Countrywide who assist in processing the loan").

[22]     *See, e.g.*, Dec. of Kevin Cunningham at ¶ 5 ("I also go to the MLS, or Multiple Listing Service, meetings where all the realtors meet to learn about the new properties on the market"); Dec. of Deborah Dexter at ¶ 7 ("I attend realtor caravans in Del Mar on a weekly basis, in order to make contacts with prospective referral sources"); Dec. of Anthony Balsamo ("every Tuesday morning from 8:30 to 10:00 a.m. I attend the San Diego Association of Realtors meeting in an attempt to drum up business"); Dec. of Mark Dudzinski at ¶ 4 ("The personal plan that I created this year includes soliciting to real estate offices on a weekly basis, participating in realtor caravans, speaking with real estate agents, and running my own broker caravans").

[23]     *See, e.g.*, Dec. of Samantha O'Rourke at ¶ 8 ) ("My number one priority is building relationships because you need to earn the trust of clients and potential clients. This is why participation in my networking group, in the Chamber of Commerce, and other activities is so important"); Dec. of Karen Lopucki ("I have become very involved in the Ramona Chamber of Commerce and also in the community where I live called Hidden Meadows and the surrounding areas"); Dec. of Monica Velarde at ¶ 7 ("I also make a lot of contacts at functions I go to because they are filled with business people who will eventually need a mortgage. If I'm in their faces enough, they'll remember me when they need a loan").

[24]     *See, e.g.*, Dec. of Adam Kline at ¶ 9 ("Approximately 30 percent of my business is return business"); Dec. of Scott Condon ("my primary business source is referrals"); Dec. of Carla Birdwell at ¶ 3 ("At this point in my career, since I have been in this business for so long, I have a lot of repeat customers, and get a lot of business from referrals from past clients");

8

1          •    The overall quality of the local real estate market.[26]

2          Given this wide range in how HLCs perform their duties, there is also a corresponding

3    wide range in how they spend their time.  Many people spend the majority of their time out of

4    the office, but this can range from just over half their time to more than 80 percent of their

5    time.[27]  In addition, some people structure their schedules so they are consistently out of the

6    office selling one or more days each week and can focus exclusively on other tasks when they

7    are in the office the remaining part of the week.[28]  Others make it a practice to spend time in the

8    office every day, and fit in outside appointments whenever it is convenient.[29]

9          With all these differences, the one constant is that Countrywide does not control or

10   monitor how their HLCs perform their duties.[30]  When HLCs are out of the office, managers do

11

12

---

13   [25]    *See, e.g.*, Dec. of Stacey Chester at ¶ 6 ("I am an endurance horse rider, and continually
     market myself and sell to all my friends and acquaintances I have made through that activity");
14   Dec. of Mark Dudzinski at ¶ 7 ("I regularly play on an ice-hockey team and have had at least
     three or four referrals/loans stemming from the friendships I have with my teammates).

15   [26]    Dec. of Greg Young at ¶ 4 ("There's nearly as much purchase activity right now
     because of declining property values.  People are waiting for property values to hit rock bottom
16   before they pounce"); Dec. of Linda Rae at ¶ 5 ("There is a huge difference in the market
     between this year and last year.  Last year, each house had about seven offers.  Now, houses are
17   staying on the market for a long time without selling or even getting offers").

18   [27]    *See, e.g.*, Declaration Ronica Bang at ¶ 5 ("I spend no less than 50% of my time out in
     the field selling.  This amount has actually decreased from when I first became a HLC, because I
19   new have a steady stream of referral business from past clients"); Dec. of Kevin Cunningham at
     ¶ 12 ("I spend at least 50 percent of my time working away from the Countywide Branch
20   office"); Dec. of Sarah Tam at ¶ 8 ("I spend at least 50% of my time working out in the field,
     selling loans in some manner"); Dec. of Mark Dudzinski at ¶ 8 ("I spend at least 50 to 60% of
21   my time working outside the office making sales calls and meeting with past, current and
     potential clients"); Dec. of Charles Manning at ¶ 4 ("I estimate I spend 75% of my time calling
22   on builders, taking them to lunch, meeting them at soccer games, playing golf and other
     community events"); Dec. of Chris Ruckel ("I spend more than 75% of my time soliciting new
23   business"); Dec. of Linda Rae at ¶ 11 ("I spend about 75% of my time out in the field and about
     25% in the office"); Dec. of Patti Self at ¶8 ("80% of the time I spend out of the office selling
24   loans.").

     [28]    *See, e.g.*, Dec. of Cheryl Jackson at ¶ 11 ("On Wednesdays, Thursdays, and Fridays, I
25   might go in the office for a little while, must most of the time I'm out in the field"); Dec. of
     Jorge Calderon at ¶ 6 ("I also set meetings with realtors for every Tuesday, Wednesday, and
26   Thursday.  On these days, I spend at least five hours a day out of the office").

27   [29]    *See, e.g.*, Dec. of Bill Arant at ¶ 6 ("In general I come in every day except on days I have
     caravans").

28   [30]    Bianchi Dec. ¶ 7.

9

1   not know how their employees are selling loans.[31]  A person could be working constantly, or not

2   working at all.[32]  The only thing Countrywide can track is performance— how many loans, at

3   what dollar figures, their HLCs are closing each month.[33]

4        Not surprisingly given that HLCs are paid 100% on commission, sales performance is

5   also what HLCs track.[34]  HLCs understand— and appreciate— that they are compensated based

6   on their production efforts.[35]  Those people who do what it takes to sell loans receive the highest

7   compensation, even if they are not the people who spend the most hours working.  Accordingly,

8   most HLCs would not be happy switching to another compensation scheme that would tie them

9   to their desk, take away their flexibility, or compensate them primarily on the time they worked

10  rather than the results they produced.[36]

---

[31]      Bianchi Dec. ¶ 7.

[32]      Bianchi Dec. ¶ 7; *see, e.g.*, ; Dec. of Patti Self at ¶ 17 ("There were times when I was unable to come to work and was receiving cancer treatment.  Nobody, including the branch manager, ever questioned my commitment to my job.  I continue to juggle work with family commitments and medical appointments related to my health."); Dec. of Scott Condon at ¶4 ("It is important to me to spend time with my family.  Therefore, I structure my days so that I can take my kids to school everyday and I am available if a family-related event comes up.  Also, I live in Carlsbad, which is about 50 miles from the branch office where I work.  Therefore, I only come into the office one day a week, as it is a long commute.")

[33]      Bianchi Dec. ¶ 7.

[34]      *See, e.g.*, Dec. of Joel Fahres at ¶ 4 ("Based on my current income goals, I know I need to close approximately 200 loans a year at a certain level"); Dec. of Deborah Dexter at ¶ 5 ("My personal business plan includes a sales volume of two (2) million dollars per month, which would generate approximately twenty thousand . . . dollars in commission"); Dec. of Adam Kline (goal is to close 86 loans per year); Dec. of Samantha O'Rourke ("My goal is to earn approximately $150,000 per year in income, which would require me to close four to five units per month, with two or three of those being purchases"); Dec. of Deborah Hartwick at ¶15 ("My personal goal is to generate a monthly sales volume of more than 3 million, which translates into approximately $10,000 to $15,000 per month in commissions.").

[35]      *See, e.g.*, Dec. of Benjamin C. Mendoza at ¶ 13 ("It would also not have made sense to be paid hourly or salaried when the commission system allows me to make more money based on my own desires and work ethic"); Dec. of Elisa Soria at ¶ 14 ("I work as much as I want to make the money I want"); Dec. of Karen Lopucki at ¶ 17 ("I know that my income is dependent directly on my personal sales abilities and Countrywide's commission system allows me to make as much money as I want based on my own work ethic"); Dec. of Mark Dudzinski at ¶ 12 ("It would also not make any sense to be paid an hourly rate when the commission system allows me to make more money based on my performance and how hard I work").

[36]      *See, e.g.*, Dec. of Patti Self at ¶ 22 ("If the job was changed and I was required to punch a time clock everyday and sit at a desk, like I did for so many years – making less than $10 per hour – I would quit this job and look for another home loan originator position with a different company"); Dec. of Fernando Jimenez at ¶ 16 ("The ability to drive my business is why I became a loan originator, and so that I would not be required to punch a time clock everyday and

10

1     This inherent fairness in the compensation system is why HLCs simply do not want to

2 change the compensation system.  This is not a job that could be done on a set schedule, where

3 people were forced to stay in the office.  Nor would people be paid fairly if they were simply

4 given a salary.  This system works for people who consciously choose a higher risk, higher

5 reward business model that also allows them the flexibility to structure their lives as they see fit.

6 **LEGAL ARGUMENT**

7 **I.**     **THIS COURT HAS THE POWER TO GRANT A DEFENSE MOTION TO DENY CLASS CERTIFICATION**

8

9     Rule 23 of the Federal Rules of Civil Procedure specifically allows ***any*** party to bring a

10 motion for a determination whether an action can properly proceed as a class action.  *See Sipper*

11 *v. Capital One Bank*, 2002 U.S. Dist LEXIS 3881 (C.D. Cal. Feb. 28, 2002) (granting "motion to

12 deny class certification").  A party may bring such a motion early in the litigation so long as the

13 court has a sufficient evidentiary basis to rule on class certification.  *See Lumpkin v. E.I. DuPont*

*De Nemours & Co.*, 14 F.R.D. 480, 481 (M.D. Ga. 1995) (denying certification early in litigation

14 because "the court is convinced that awaiting further discovery will only cause needless delay

15 and expense.")  As explained below, the fifty (50) declarations Countrywide submits with this

16 motion should be sufficient to establish ***definitively*** that class certification is inappropriate here.

17 Accordingly, the Court can and should enter an order denying certification without further delay.

18 **II.**     **CLASS CERTIFICATION IS IMPROPER HERE BECAUSE PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS OF RULE 23(B)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

19

20

21     To certify a case under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") the

22 court must satisfy itself that all the essential elements are satisfied.  The plaintiff must establish

---

23 sit at a desk.  It is clear to me, based on the sales nature of this job, that it should not be based on
the number of hours worked"); Dec. of Sabrina Thai at ¶ 11 ("I think that the current commission
24 schedule is the best way to compensate me for what I do.  I do not think I would be compensated
fairly if I had to punch a clock.  I make good money and do not want to be paid on an hourly
25 basis"); Dec. of Scott Condon at ¶ 8 ("If my position was restructured as an hourly position,
requiring me to be in the office a set 9-5 schedule, I would probably quit and look for another job
26 because it would not give me the flexibility and money-earning potential I desire"); Dec. of Chris
Ruckel at ¶ 19 ("I like working on a commission basis because there is no ceiling on my
27 potential earnings.  There are not that many jobs out there that allows you to make $20,000 per
month with high school education").
28

11

1   the elements under Rule 23(a) of numerosity, commonality, typicality, and adequacy of class

2   representative and counsel, and then must satisfy one of the elements under Rule 23(b).  The

3   Supreme Court has directed district courts to conduct a "rigorous analysis" to determine whether

4   the requirements of Rule 23 are met prior to certifying a class. *General Telephone Co. of S.W. v.*

5   *Falcon*, 457 U.S. 147, 161 (1982) (emphasis added).[37]

6       Where, as here, the primary relief Plaintiffs seek is damages rather than an injunction, the

7   Plaintiffs must satisfy the elements of Rule 23(b)(3).[38]  That is, the Court must conclude that

8   common issues predominate over individualized issues ("predominance") and that class litigation

9   is the superior method of litigating the case ("superiority").  *See Poulos v. Caesars World, Inc.*,

10  379 F.3d 654 (9th Cir. 2004).  As explained below, Plaintiffs cannot establish either

11  predominance or superiority here.

12      **A.    Plaintiffs Cannot Establish Predominance of Common Issues**

13      The central inquiry in deciding predominance is whether the proposed classes are

14  sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150

15  F.3d 1011, 1022 (9th Cir. 1998).  To establish predominance, the party seeking certification must

16  establish that "common questions present a significant aspect of the case and . . . can be resolved

17  for all members of the class in a single adjudication."  *Id.*

18      **1.    An Examination of The Essential Elements of The Outside Sales**
        **Exemption Reveals Substantial Individualized Issues**

19

20      Class determination "generally involves considerations that are enmeshed in the factual

21  and legal issues comprising the plaintiff's cause" such that it is often "necessary for the court to

22  probe behind the pleadings before coming to rest on the certification question." *Falcon,* 457 U.S.

23  at 160.  In other words, the fact that this Court is not deciding the merits of Plaintiffs' claims

---

24  [37]     Although this motion focuses entirely only the Rule 23(b) factors, Countrywide is not
25  stipulating that this action satisfies all the Rule 23(a) factors.  Rather, the impossibility of
    satisfying Rule 23(b) is what makes this case proper for a defense motion to deny certification.

26  [38]     Although certification can be pursued alternatively under Rule 23(b)(1) or Rule 23(b)(2),
    certification under those sections is inappropriate in a standard wage and hour class action where
27  the plaintiff primarily seeks monetary relief. *See Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D.
    229, 244-46 (C.D. Cal. 2006) (finding that exemption class action not suitable for certification
28  pursuant to Sections (b)(1) or (b)(2)).

12

1    "should not be talismanically invoked to artificially limit" its examination of the factors

2    "necessary to a reasoned determination" of whether Plaintiffs can satisfy all of the class action

3    requirements. *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984); *accord Fireside Bank*

4    *v. Superior Court*, 40 Cal. 4th 1069, 1091-92 (2007) (trial court deciding certification needs to

5    consider the elements of a claim and how "various claims and defenses relate and may affect the

6    course of the litigation.")

7         Accordingly, the first step in deciding certification is for the Court to determine the

8    elements of the claims and defenses at issue so that the Court may "determine whether the

9    alleged claims can be properly resolved as a class action." *Sepulveda v. Wal-Mart Stores, Inc.*,

10   237 F.R.D. 229, 233 (C.D. Cal. 2006), *citing Newton v. Merrill Lynch, Pierce, Fenner & Smith*

11   *Inc.*, 259 F.3d 154, 168 (3rd Cir. 2001). Here, to determine whether common issues

12   predominate, the Court must first examine the elements of the outside sales exemption, and then

13   determine whether the issues can be fairly resolved here using collective proof. *Jimenez v.*

14   *Domino's Pizza, Inc.* 238 F.R.D. 241, 251 (C.D. Cal. 2006) ("To determine whether common

15   issues predominate, this Court must first examine the substantive issues raised by Plaintiffs and

16   second inquire into the proof relevant to each issue.").

17        If the Court determines that, after resolution of the common issues, there will remain

18   substantial, individualized issues to resolve, then class certification is inappropriate. *See*

19   *Sepulveda*, 237 F.R.D. at 247-48; *accord Washington Mutual Bank v. Superior Court*, 24 Cal.

20   App. 4th 906, 913-14 (2001) ("each member must not be required to individually litigate

21   numerous and substantial questions to determine his right to recover following the class

22   judgment."). As explained below, individual proof will be required to determine the essential

23   elements of the outside sales exemption as to any particular HLC—i.e., did the HLC customarily

24   and regularly spend the majority of his work time away from the employer's place of business

25   selling tangible or intangible items or obtaining orders or contracts for products, services or use

26   of facilities.

27

28

13

1

                  **a.**      **The Outside Sales Exemption Applies to Employees,**
                                  **Like HLCs, Who Work Outside The Employer's**

2                                  **Control and Earn Money Based on Their Sales Level**

3         The outside sales exemption is codified in Section (1)(C) of the governing IWC Wage

4   Order (No. 4).  Section (1)(C) states that the provisions of the Wage Order (which includes the

5   overtime and meal period requirements at issue in this lawsuit) "shall not apply to outside

6   salespersons."  Section (2)(M) of the Wage Order then defines an outside salesperson as

7   someone "who customarily and regularly works more than half the working time away from the

8   employer's place of business selling tangible or intangible items or obtaining orders or contracts

9   for products, services, or use of facilities."  Although the California outside sales exemption

10  differs from the federal outside sales exemption in terms of the amount of time the employee

11  must devote to outside sales activity (see *Ramirez* discussion, *infra*), the policy underlying both

12  versions of the outside sales exemption is to address the difficulty in supervising employees who

13  work away from the employer's premises and who typically earn money based on their sales:

14          "The reasons for excluding an outside salesman are fairly apparent.  Such
           salesman, to a great extent, works individually.  There are no restrictions
15          respecting the time he shall work and he can earn as much or as little, within the
16          range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily
17          receives commissions as extra compensation.  He works away from his
           employer's place of business, is not subject to the personal supervision of his
18          employer, and his employer has no way of knowing the number of hours he works
19          per day.  To apply hourly standards primarily devised for an employee on a fixed
20          hourly wage is incompatible with the individual character of the work of an
           outside salesman."
21

22  *Jewel Tea Co v. Williams*, 118 F. 2d 202, 207-08 (10th Cir. 1941); *see also Billingslea v Brayson*

23  *Homes, Inc.*, 2006 U.S. Dist. LEXIS 11707 at *24 (noting similar rationale for outside sales

24  exemption).[39]

25      [39]     In addition, the Department of Labor has found that mortgage loan officers can meet the
    "outside sales" exemption if they:  (1) meet with prospective clients at locations other than the
26  employer's business; (2) contact clients by telephone, mail and email as an adjunct to their in-
    person contacts; (3) obtain credit information and other necessary documents for the loan
27  application process; (4) call on real estate agents/ brokers, financial advisors, and other potential
    referral sources to develop borrower leads; (5) engage in marketing and promotional activities in
28  support of their own sales; and (6) have flexibility to set their working hours and to schedule the

14

1    Here, it is plain that the HLC position is the sort of position that *generally* fits within the

2    scope of the outside sales exemption.  While there will be variations material to the issue of

3    whether any given HLC spends enough time "outside" to qualify for the exemption (explained

4    below), the HLC job plainly is one focused overwhelmingly on the goal of selling loans.  It is

5    also a job where the employees' incomes are entirely dependent on how much they sell.

6    Furthermore, HLCs are free, if they desire, to work as much time away from their Countrywide

7    office as they desire.  Accordingly, there is no plausible argument that HLCs are misclassified as

8    a group because the job was designed as a non-sales or "inside" job.

9               **b.      California Looks To How Employees Actually Spend**
                         **Their Individual Workdays To Decide Whether They**
10                        **Meet the Outside Sales Exemption**

11    In *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785 (1999), the California Supreme Court

12    held that California takes a quantitative approach to the outside sales exemption such that

13    employees whose "primary duty is selling" but who do not customarily and regularly spend more

14    than half the working time on sales related activities will not qualify for the exemption.  *Id.* at

15    797-78.  The court further held that the application of the exemption turns primarily on "how the

16    employee actually spends his or her time."  *Id.* at 802.  Although the Court held that the

17    employer's "realistic expectations" as to how the job should be performed are relevant, and that

18    an employee cannot make himself non-exempt by failing to perform his job consistent with

19    realistic expectations that would render him exempt, the primary determinant of whether an

20    employee is exempt remains how the employee ***actually*** performs the job.  *Id*; *see also*

21    *Sepulveda*, 237 F.R.D. at 246 ("Ramirez calls for two-step inquiry.  First, the court must

22    examine, in an individualized fashion, the work actually performed by an employee.")

23               **c.      Individual Employees Who "Customarily and**
                         **Regularly" Spend The Majority of Their Workday**
24                        **Engaged in Outside Sales Activity Meet the Exemption**

25    A person "customarily and regularly" performs a task when he or she does the task on a

26    regular, recurrent basis.  Accordingly, so long as HLCs recurrently has days where he spends the

27    _____

tasks they perform during the work week.  Mar. 31, 2006 DOL Opinion Letter, p. 1.  HLCs
28   generally satisfy all of these elements.

15

1   majority of the workday on outside sales activity, those HLCs will satisfy the outside sales

2   exemption.  This is a particularly fact-intense inquiry.  The trier of fact must evaluate whether

3   overall the HLCs have enough days where they spend over 50% of their time on outside sales

4   activities to qualify for the exemption.

5          No California case has construed the meaning of the phrase "customarily and regularly"

6   within any part of the wage orders, but the term appears in other places within the same Wage

7   Order, notably within the executive and administrative exemptions.  Wage Order 4-2001 §§

8   (1)(A)(1)(b) and (1)(A)(2)(b).  Under general principles of statutory construction in California,

9   "unless a contrary intent appears, the court presumes that the Legislature intended that similar

10  phrases [in different parts of a statute] be accorded the same meaning."  *People v. Wells* 12 Cal.

11  4th 979, 986 (1996).

12         With respect to both those exemptions, the Wage Order expressly provides that the

13  definition of "customarily and regularly" is based on the federal regulation defining the term

14  within the context of the Fair Labor Standards Act.  Wage Order 4-2001 §§ (1)(A)(1)(b) and

15  (1)(A)(2)(b) (incorporating by reference the 2001 versions of 29 C.F.R. § 541.106 and 29 C.F.R.

16  §542.207, both defining "customarily and regularly").  The FLSA regulations define

17  "customarily and regularly" as "greater than occasional[ly] but . . . .less than constant[ly]."  The

18  regulations go on to state that "tasks performed 'customarily and regularly' includes work

19  normally and recurrently performed every workweek," but not "isolated or one-time tasks."  *Id.*;

20  *see also* Department of Labor ("DOL") Opinion Letter 1.25.07-1, p. 3 (noting that a task can be

21  customarily and regularly performed even when ***not*** performed "each and every workweek").

22         In the March  31, 2006 DOL Opinion Letter in which the DOL concluded that certain

23  loan originators qualified as outside salespersons under the FLSA, the DOL noted that

24  "customarily and regularly performing outside sales" means that the employee's "qualifying

25  exempt outside sales activities must normally and recurrently [be] performed every workweek."

26  Such tasks could not be "isolated or one time tasks."  *Id.* at p. 2.  Accordingly, there is no

27  requirement that a standard be met every single day for it to "customarily and regularly" be met.

28

16

1    Case law construing the FLSA sheds additional light on the meaning of "customarily and

2    regularly." Cases under the executive exemption have stated that doing exempt duties only one-

3    third of the total work time, but on a regular recurring basis, qualified as performing the task

4    "customarily and regularly." *See Baca v. United States*, 1 Wag. & Hour Cas. 2d (BNA) 1066

5    (U.S. Fed. Cl. 1993).  In another case, the court noted that it was not fatal to the exemption that

6    the employee spent less than half of his total work time supervising employees.  He still

7    "customarily and regularly" supervised employees because "his role as a relief supervisor was

8    expected, relied upon and regularly performed" and was his role "on more than isolated or

9    occasional incidents." *Shriner v. Smurfit-Stone Container*, 2006 Mont. Dist. LEXIS 606 (D.

10   Mont. Aug. 30, 2006).

11       Applying this "customarily and regularly" standard to Countrywide HLCs means that

12   HLCs need to regularly and recurrently spending the majority of their workdays engaged in

13   outside sales activity to meet the exemption.  This obviously would be satisfied in the common

14   situation where the HLC works the majority of his or her total worktime engaged in outside sales

15   activity.  It is important to note, however, that the "customarily and regularly" standard is also

16   satisfied in the situation where an HLC reserves one or more days every week in which the HLC

17   spends the majority of the day engaged in outside sales activities.  In such a case, the HLC may

18   spend less than the majority of his or her ***overall*** time on outside sales, but ***will regularly and***

19   ***recurrently*** spend the majority of a workday on outside sales.  In any event, to determine

20   whether any HLC meets the quantitative standard under California law will require a particularly

21   individualized analysis of each HLC's work habits to determine if the HLC spends enough of his

22   or her time on outside sales to meet the exemption.

23           **2.    There is No Way to Determine The Elements of The Outside**
                     **Sales Exemption of the Putative Class Using Collective Proof**
24
25       The declarations submitted here establish overwhelmingly that the HLC position was

26   *designed* to be, and class members *expected* it to be, an outside sales position.[40]  They also

---

27   [40]    *See, e.g.*, HLC Essential Function Job Description ("Primary responsibility is
     representing Countrywide in the local community among Realtors, Builders and other potential
28   business partners by developing relationships with, and extracting referral business from these
     accounts"); Dec. of Jorge Calderon at ¶ 7 ("My title is HLC, and because of that title I cannot

17

1  establish that there is no across-the-board policy or procedure that would defeat this expectation

2  for the HLCs as a whole. The members of the putative class differ greatly with respect to how

3  they **actually devoted** their work time toward the common goal of making sales. For example,

4  the time individual HLCs spend traveling varies widely.[41] How individual HLCs choose to

5  structure their days varies as well.[42] There further is wide disparity as to the number of hours

6  people work per day, and per week.[43] Personal responsibilities also can vary, impacting not only

7  how HLCs spend their time, but also how much time they are willing to be away from home.[44]

8

---

9  stay in the office and wait for walk ins. My job is to go out and bring new business in"); Dec. of
Sabrina Thai at ¶ 6 ("It is important to me to meet with my clients in person. Countrywide is a
10  big company with a big name and it is important to show that we provide professional services. I
also believe that clients will trust me more if I take the time to meet with them in person"); Dec.
11  of Patti Self at ¶ 5 ("Many of my clients are not very sophisticated when it comes to home loans
and real estate purchases and I often meet with my clients face-to-face so that I can explain the
12  different options and home loan products to them.").

13  [41]    See, e.g., Dec. of Duan "Young" Nguyen at ¶ 7 ("if I am visiting a client in Long Beach
or Los Angeles, I usually end up spending most of the day driving and meeting with my
14  clients"); Dec. of Scott Condon at ¶ 4 ("I live in Carlsbad, which is about 50 miles from the
branch office where I work. Therefore, I only come into the office one day a week, as it is a long
15  commute"); Dec. of Fernando Jimenez at ¶ 4 ("I commute to Arbuckle, California, which is
approximately a one-hour drive from Elk Grove, California, to spend time at my builder location
16  and at one of the real estate companies I service"); Dec. of Patti Self at ¶4 ("Even though I am
based in the Carmel Valley branch, I serve a different geographic market and different socio-
17  economic market than other Home Loan Consultants in my branch. My personal focus is in
North San Diego County, including the cities of Vista, Valley Center, Ramona, Escondido and
18  surrounding areas.").

19  [42]    See, e.g., Dec. of Elisa Soria at ¶ 13 ("I'm usually out of the office all day on Fridays
because I schedule my visits to non-profit organizations, such as Los Angeles Housing and East
20  Los Angeles Corporation, for pre-approvals"); Dec. of Chris Ruckel at ¶ 8 ("every Monday I
spend approximately two and a half hours meeting with people in real estate offices in our
21  area"); Dec. of Kevin Cunningham at ¶ 1 ("There are days when I am not in the office at all, but
I don't have a set schedule of days I'm not at the office. Typically, I come in every day to at
22  least check my messages"); Dec. of Alfonso Hernandez at ¶ 7 ("I currently focus on being out of
the office almost the entire day on Mondays and Wednesdays. On those days, I only check in at
23  the office before I go back out to meet with realtors, developers, or other customers. Every other
day, I spend at least two hours a day out of the office"); Dec. of Cheryl Jackson at ¶ 9 ("on
24  Thursdays I usually visit real estate offices in Barstow and Helendale from about 9 a.m. to 2 p.m.
On Wednesdays, I usually visit realtors' offices in Victorville. On Fridays, I usually visit
25  realtors' offices in Hesperia and Apple Valley Run from about 9 a.m. to 12 p.m. On other days, I
set up appointments with realtors whenever I can schedule them around my appointments with
26  clients"); Dec. of Larry Hubbard at ¶ 11 ("One of the main perks of my job is that I can spend
my work day however I wish. I can come and go as I please and am not required to punch a time
27  clock or sit at a desk for 8 hours a day.").

[43]    See, e.g., Dec. of Gabriel Gomez at ¶ 4 ("my hours from week to week, fluctuate greatly.
28  On some days I only work one or two hours, and on other days I work eight hours. I rarely, if
ever, work more than eight hours per day. On most days I work about six hours"); Dec. of

18

1    These differences mean that the question before the Court is whether "the actual mix of

2    duties worked … entails a need to conduct an individual inquiry for each class member."

3    *Jiminez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 252 (C.D. Cal. 2006); *see also Walsh v. Ikon*

4    *Office Solutions, Inc.*, 148 Cal. App. 4th 1440, 1454 (2007) ("The outside salesperson exemption

5    turns on how the employee actually spends his or her time as well as the employer's realistic

6    expectations of the job and the extent to which the employee diverges from them."). A closer

7    look at the specific issues that must be decided to determine the applicability of the outside sales

8    exemption further shows the need for individualized determinations for each HLC to determine

9    if they are properly classified.

10    Specifically, all of the following individual factors will impact a particular HLCs mix of

11    work time between outside sales and other activities:

12    •    The HLC's use of real estate caravans;[45]

13    •    The HLC's use of Chamber of Commerce, Building Industry Association, and
         other business group meetings to generate business;[46]

14

---

15    Charles Manning at ¶ 5 ("I set my own schedule and, some might say, keep bankers hours. I
      generally try and come in before 9:30 a.m. and leave early afternoon"); Dec. of Sonia Teran ("As
16    a HLC, I have no set schedule. I try to put in 40 hours a week because I know that more I work,
      the more I will bring in"); Dec. of Rob Roberson at ¶ 10 ("I spend about 50 or 60 hours per week
17    working").

18    [44]   *See, e.g.*, Dec. of Cheryl Jackson at ¶ 6, 13 (flexibility of the position allows her to
      balance personal business goal of $65,000 with need to be available to pick up daughter from
19    dialysis treatments); Dec. of Linda Rae at ¶ 15 (was able to have carpal tunnel surgery without
      most of her customers even knowing she was gone and still make the kind of money she wants);
20    Dec. of Scott Condon at ¶ 4 (structures his days so he can take his kids to school every day and
      be available for family related events); Dec. of Gabriel Gomez at ¶ 5 (leaves work twice a week
21    at 3:00 p.m. to attend daughters' soccer games); Dec. of Alfonso Hernandez at ¶¶ 5, 6 (unlike
      previous 9-7 job, he can now spend more time with family but still make good money).

22    [45]   *See, e.g.*, Dec. of Kevin Cunningham at ¶ 5 ("I also go to the MLS, or Multiple Listing
      Service, meetings where all the realtors meet to learn about the new properties on the market");
23    Dec. of Deborah Dexter at ¶ 7 ("I attend realtor caravans in Del Mar on a weekly basis, in order
      to make contacts with prospective referral sources"); Dec. of Anthony Balsamo ("every Tuesday
24    morning from 8:30 to 10:00 a.m. I attend the San Diego Association of Realtors meeting in an
      attempt to drum up business"); Dec. of Mark Dudzinski at ¶ 4 ("The personal plan that I created
25    this year includes soliciting to real estate offices on a weekly basis, participating in realtor
      caravans, speaking with real estate agents, and running my own broker caravans").

26    [46]   *See, e.g.*, Dec. of Samantha O'Rourke at ¶ 8 ) ("My number one priority is building
      relationships because you need to earn the trust of clients and potential clients. This is why
27    participation in my networking group, in the Chamber of Commerce, and other activities is so
      important"); Dec. of Karen Lopucki ("I have become very involved in the Ramona Chamber of
28    Commerce and also in the community where I live called Hidden Meadows and the surrounding

19

1    •    How often the HLC visits realtor offices;[47]

2    •    Whether the HLC needs to visit builder sites;[48]

3    •    Whether referrals and refinances are a viable source of business for the HLC;[49]

4    •    The HLC's individual personal and family-related needs;[50] and

5

---

6    areas"); Dec. of Monica Velarde at ¶ 7 ("I also make a lot of contacts at functions I go to because they are filled with business people who will eventually need a mortgage. If I'm in their faces enough, they'll remember me when they need a loan"); Dec. of Joel Fahres at ¶ 5 (attends Building Industry Association events which occur once a month, generally lasting about two and one-half hours); Dec. of Charles Manning at ¶ 4 ("I also attend BIA meetings every other month in North County").

7

8

9    [47]    See, e.g., Dec. of Chris Ruckel at ¶ 8 ("every Monday I spend approximately two and a half hours meeting with people in real estate offices in our area"); Dec. of Kevin Cunningham at ¶ 1 ("There are days when I am not in the office at all, but I don't have a set schedule of days I'm not at the office. Typically, I come in every day to at least check my messages"); Dec. of Alfonso Hernandez at ¶ 7 ("I currently focus on being out of the office almost the entire day on Mondays and Wednesdays. On those days, I only check in at the office before I go back out to meet with realtors, developers, or other customers. Every other day, I spend at least two hours a day out of the office"); Dec. of Cheryl Jackson at ¶ 9 ("on Thursdays I usually visit real estate offices in Barstow and Helendale from about 9 a.m. to 2 p.m. On Wednesdays, I usually visit realtors' offices in Victorville. On Fridays, I usually visit realtors' offices in Hesperia and Apple Valley Run from about 9 a.m. to 12 p.m. On other days, I set up appointments with realtors whenever I can schedule them around my appointments with clients").

10

11

12

13

14

15    [48]    See, e.g., Dec. of Adam Kline at ¶ 7 ("On a weekly basis, I also meet prospective clients and conduct pre-approvals at a new housing development in my area"); Dec. of Scott Uhls at ¶¶ 10-11 ("The amount of face-to-face interaction I need with my clients depends on the situation. Some builders are very needy and it is important to meet face to face with them very often. With others, I have developed a strong relationship over time with them so I only need to check in from time to time. . . . With one of my builders, I meet with him every Wednesday for a few hours. I go over the status of loans in the pipeline with him and address any other issues he may have. The builder does not require these meetings, but it is nice to be there to personally take care of things"); Dec. of Fernando Jimenez at ¶ 4 ("While in the builder's office, I attend meetings, meet with any realtors that may come in and other clients related to the builder, and make customer service calls").

16

17

18

19

20

21    [49]    See, e.g., Dec. of Adam Kline at ¶ 9 ("Approximately 30 percent of my business is return business"); Dec. of Scott Condon ("my primary business source is referrals"); Dec. of Carla Birdwell at ¶ 3 ("At this point in my career, since I have been in this business for so long, I have a lot of repeat customers, and get a lot of business from referrals from past clients").

22

23    [50]    See, e.g., Dec. of Cheryl Jackson at ¶ 6, 13 (flexibility of the position allows her to balance personal business goal of $65,000 with need to be available to pick up daughter from dialysis treatments); Dec. of Linda Rae at ¶ 15 (was able to have carpal tunnel surgery without most of her customers even knowing she was gone and still make the kind of money she wants); Dec. of Scott Condon at ¶ 4 (structures his days so he can take his kids to school every day and be available for family related events); Dec. of Gabriel Gomez at ¶ 5 (regularly leaves work twice a week at 3:00 p.m to attend daughters' soccer games); Dec. of Alfonso Hernandez at ¶¶ 5, 6 (unlike previous 9-7 job, he is now able spend more time with his family but still make a good living); Dec. of Orval Hughes at ¶ 9 ("I have the autonomy to change my schedule to fit my customers' or my own personal needs and am able to take time off during the day to take care of personal errands, as I determine."); Dec. of Deborah Dexter at ¶6 ("I am a single parent and am

24

25

26

27

28

20

- How the HLC balances duties and goals and structures his or her days and weeks.[51]

This mix of duties is so broad, and so varied, that the claims in this matter cannot be determined on a class-wide basis. Even if there may be some individual HLCs whose specific mix of duties may not always qualify them for the outside sales exemption, the only way to determine who falls into that category is to make an individualized determination as to how any given HLC spends his or her time on a daily and weekly basis. The need for an individualized, fact specific inquiry to determine whether any given HLC is exempt precludes for class certification. *See Jiminez*, 238 F.R.D. at 252; *Sepulveda*, 237 F.R.D. at 248-49. As a California Court of Appeal panel explained in examining another purported class of employees whose job duties varied markedly, class certification was properly denied because "individual circumstances . . . affect whether any particular subclass member did, in fact, 'customarily and regularly' spend over 50 percent of his or her time outside the office on sales activity." *Walsh*, 148 Cal. App. 4th at 1456.

**B.      Plaintiffs Cannot Satisfy the Superiority Requirement of Rule 23(b)(3)**

**1.      The Stakes Are Large Enough Here to Give Incentive to HLCs To Litigate Their Claims Individually**

Before certifying a class, the Court must also determine that the class action mechanism is superior to other methods of adjudication. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Where predominant individualized issues make a class action difficult to manage and the putative class members could instead resolve their claims individually through

---

responsible for providing care for my elderly mother. As a loan originator for Countrywide, I have a flexible schedule which allows me to attend to my parenting and eldercare responsibilities.").

[51]     *See, e.g.*, Dec. of Elisa Soria at ¶ 13 ("I'm usually out of the office all day on Fridays because I schedule my visits to non-profit organizations, such as Los Angeles Housing and East Los Angeles Corporation, for pre-approvals"); Dec. of Gabriel Gomez at ¶ 4 ("my hours from week to week, fluctuate greatly. On some days I only work one or two hours, and on other days I work eight hours. I rarely, if ever, work more than eight hours per day. On most days I work about six hours"); Dec. of Charles Manning at ¶ 5 ("I set my own schedule and, some might say, keep bankers hours. I generally try and come in before 9:30 a.m. and leave early afternoon"); Dec. of Sonia Teran ("As a HLC, I have no set schedule. I try to put in 40 hours a week because I know that more I work, the more I will bring in"); Dec. of Rob Roberson at ¶ 10 ("I spend about 50 or 60 hours per week working").

21

1    an alternative mechanism, then class certification is inappropriate. *See Jimenez*, 238 F.R.D. at

2    253 (finding that allowing managers to litigate exemption claims individually would be superior

3    to class litigation).

4          Plaintiffs' claims and any claims of individual HLCs do not require class treatment to be

5    viable. Those HLCs who believe they have meritorious claims have great incentive to pursue an

6    action on their own. For example, if an HLC earned $300,000 per year and establishes that he

7    was misclassified and worked an average of five hours of overtime per week throughout the class

8    period, that HLC's individual claim for back overtime would be worth ***$225,000*** (exclusive of

9    interest, fees or penalties). The existence of this large potential recovery for class members is a

10   factor weighing against certification. *See Ford v. NYLCare Health Plans, Inc.*, 190 F.R.D. 422,

11   427 (S.D. Tex. 1999) (no superiority where individual putative class members had claims worth

12   more than $100,000); *see also Spoon v. Superior Court* (1982) 130 Cal. App. 3d 735, 745

13   (contrasting case with classic class action involving "the overpayment of a few cents for a taxi

14   fare, or purchase of a bag of 'Frito' corn chips.").

15         Furthermore, this is not a case where the bulk of the class members are ignorant of the

16   existence of the lawsuit or a mechanism to follow to seek recovery if they believe they are

17   aggrieved. On the contrary, each and every putative class member received a pre-certification

18   notice that informed them about the case and provided contact information for Plaintiffs'

19   counsel, Cohelan & Khoury. To the extent they sign up with Cohelan & Khoury and litigate

20   their claims individually, they will be entitled to attorney's fees as a matter of right, while they

21   will face no real risk of an award of attorney's fees should Countrywide prevail. *See Earley v.*

22   *Superior Court*, 79 Cal. App. 4th 1420, 1430-31 (2000) (employer not entitled to recover

23   attorney's fees when prevailing against an employee in claim for overtime wages); *see also*

24   *Hackett v. General Host Corp.*, 455 F.2d 618 (3rd Cir. 1972) (recognizing that, even with small

25   claims, availability of attorney's fees can make them viable).

26         If individual HLCs do not want to use Cohelan & Khoury to pursue their individual

27   claims, they have a quick and cost-effective alternative mechanism of bringing individual claims

28   before the Labor Commissioner and receiving a "Berman hearing" without an attorney and at no

22

1   cost. *See Jimenez*, 238 F.R.D. at 253 (recognizing Berman hearing as cheap, speedy alternative

2   for resolving individual exemption claims).

3      Given the predominant individualized issues in this case, and the better alternatives

4   available than collectively litigating the case of a class of more than 3000 HLCs, the Court has

5   an ample basis to deny class certification here.

6      **2.     There is a Conflict Among The Class That Renders Class Litigation Inappropriate**

7

8      Separate and apart from the predominant individualized issues in this case, it is well

9   settled law that the class action mechanism is inappropriate (and thus, not superior) where there

10   is a substantial conflict among the putative class as to whether the action should be prosecuted.

*Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997) (one factor toward superiority is "interest

11   of members of the class in individually controlling the prosecution").[52] Here, there is

12   overwhelming evidence that current employees like being paid as outside salespersons, benefit

13   from the system, and have no interest in being forced into a system where they are paid based on

14   the hours they work. Former employees, like Raymond Vinole and Ken Yoder, who likely will

15   never work for Countrywide again and who will not be impacted by any change to

16   Countrywide's pay structure, but will receive back pay if the suit prevails, have a conflict with

17   the great majority of current HLCs who do not support the goals of this lawsuit.

18      Effectively, what Plaintiffs are asking for is that the autonomy of current HLCs cease. If

19   employees are paid by the hour, the employer must track the hours and evaluate the value of each

20   hour spent. A manager may not choose to pay an employee for a day at the golf course, an

21   afternoon at a Padres game or a realtor caravan tour, even though the HLC thinks this is her best

22   opportunity to make contacts. Hourly employees also could not have the flexibility HLCs

23   currently enjoy, and in fact relish.

24

---

25   [52]    This defect is sometimes raised under Rule 23(a) where the particular plaintiff has an

26   antagonism to the overall putative class. *See Crawford v. Honig*, 37 F. 3d 485, 487 (9th Cir. 1994) (adequate representation depends upon "an absence of antagonism" and shared interest

27   between proposed representatives and absent members); *Sweet v. Pfizer*, 232 F.R.D. 360, 370 (C.D. Cal. 2005) (conflicts made "the class representatives and class counsel, despite their

28   apparent best intentions, inadequate under Rule 23(a)(4).").

LA1 6646215.5

1    In such circumstances where there is a conflict between current and former employees in
2    the class, courts have routinely denied class certification on the basis of inter-class conflict.  For
3    instance, in *Southern Snack Foods, Inc. v. J&J Snack Foods Corp.*, 79 F.R.D. 678, 681 (D.N.J.
4    1978), the court denied certification of a class of former and current franchisees because the
5    plaintiff "offered no compelling reason for the court to deviate from the general rule that former
6    class members are not adequate representatives of the class." (Emphasis supplied.)  *See also Van*
7    *Allen v. Circle K Corp.*, 58 F.R.D. 562, 564 (C.D. Cal. 1972) (certification denied when interests
8    of a class including both present and former independent operators were adverse); *Matarazzo v.*
9    *Friendly Ice Cream Corp.*, 62 F.R.D. 65, 68 (E.D.N.Y. 1974) (class denied because "former
10   store managers do not have the same interests of present store managers").

11   Just as in the above cases, the court refused to certify the class because of an absence of
12   evidence that the putative class supported the case or would benefit from the class litigation
13   mechanism.  There is nothing stopping Plaintiffs from asserting that they individually were
14   misclassified and seeking monetary recovery for the misclassification.  Indeed, denying
15   certification here will not deprive any individual HLC of his or her rights to seek recovery.  But
16   requiring that suits be brought individually rather than as a class will avoid the class conflicts
17   that render this case inappropriate for class treatment.

18                                    **CONCLUSION**

19   For the reasons outlined above, Countrywide respectfully requests that the Court enter an
20   order denying class certification.

21   DATED: August 7, 2007                    SEYFARTH SHAW LLP

22                                            By_____
23                                                Thomas R. Kaufman
                                             Attorneys for Defendant
24                                           COUNTRYWIDE HOME LOANS, INC.

25

26

27

28

                                    24